Filed 7/23/24  Williams Scotsman v. Gagliardi CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| WILLIAMS SCOTSMAN, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> PAMELA GAGLIARDI, <br><br> Defendant and Appellant. | D081776 <br><br><br> (Super. Ct. No. 37-2021-00034299-CU-BC-NC) |


APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Pamela Gagliardi, in pro. per., for Defendant and Appellant.

Law Offices of Howard Goodman, Howard Goodman; and Dilip Vithlani for Plaintiff and Respondent.


INTRODUCTION

Pamela Gagliardi appeals from a judgment for replevin and damages. The judgment directs her to return a modular office unit to its rightful owner, Williams Scotsman, Inc. (WSI), or pay WSI damages of $22,000 for converting it to her own use.  The judgment further directs Pamela to pay $9,752.40 to

WSI for loss of use during the period WSI was deprived of possession. Pamela contends (1) WSI failed to sue her within the statute of limitations, (2) WSI lacked standing to sue because it was not the owner of the modular office unit, (3) the trial court committed various evidentiary errors during trial, (4) the "elements of replevin were not satisfied," and (5) the trial court calculated damages incorrectly.

Pamela forfeited most of her arguments on appeal by failing to raise issues at the trial court level and failing to comply with the rules of appellate procedure here on appeal. We address her statute of limitations, standing, and liability arguments. We see no reason to exercise our discretion to address her other forfeited arguments. We affirm the trial court's judgment on all points.

PROCEDURAL AND FACTUAL BACKGROUND

I.

*WSI's Modular Office Unit Is Rented by a Third Party and Placed on Pamela's Property*

Pamela owned two parcels of land in Bonsall including 30464 North River Road. Starting in 2012, a company named Multi Cable Inc. (MCI) leased a portion of the 30464 North River Road parcel from Pamela for its business operations.

In 2016, MCI leased a modular office unit from Modular Space Corporation (ModSpace). The modular office unit was delivered to Pamela's property at 30464 North River Road. WSI subsequently acquired ModSpace and several related companies. The acquisition included all of the companies' assets including title to the modular office unit. The certificate of title for the unit set forth the manufacturer serial number and indicated the unit measured 47 feet by 10 feet.

2

In January 2018, after the Lilac wildfire,[1] MCI abandoned Pamela's property, leaving the modular office unit and other personal property behind. In April of 2019, MCI stopped paying rent to WSI for the unit.

On May 25, 2021, a WSI employee went to Pamela's property and ascertained the unit was still there. The employee identified the unit as the one belonging to WSI and took a video to memorialize the identification. A WSI employee emailed Pamela requesting return of the unit, but the unit was not returned.

II.

*WSI Sues Pamela To Recover the Modular Office Unit*

On August 11, 2021, WSI sued MCI, MCI's president, and Pamela. The complaint sought in the alternative (1) the return of the mobile office unit, (2) permission to enter Pamela's property and remove the unit, or (3) damages of $25,000 representing the unit's value. The complaint also sought damages for loss of use.

WSI later dismissed MCI's president and MCI as defendants to the lawsuit. As a result, the remaining counts in the operative complaint alleged replevin and conversion causes of action solely against Pamela.

Pamela answered the complaint on October 13, 2021. Pamela denied WSI had an ownership interest in any personal property on the 30464 North River Road parcel. Without filing a cross-complaint, Pamela requested "storage charges" and "[d]emolition and [d]ump fees" in the amount of $107,300 "in the event that [WSI] is the owner of any personal property abandoned at 30464 North River Road Bonsall CA 92003 since April of 2019."

---

[1] The Lilac Fire was a fire that burned in northern San Diego County, California, United States, and the second-costliest one of multiple wildfires that erupted in Southern California in December 2017.

3

On January 14, 2022, the trial court issued an order to show cause (OSC) why the case should not be dismissed for failure to prosecute. WSI responded to the OSC with information about its attempt to settle the case as well as other information.

Unremarkably—but later raised as an issue at trial by Pamela—counsel for WSI made two errors in the declaration that responded to the OSC. Counsel twice stated the parcel was located at "30454" North River Road instead of "30464" North River Road. It is obvious these were typographical errors. Later in the exact same declaration, counsel correctly identified the parcel as 30464 North River Road. The declaration included as an exhibit a property report for 30464 North River Road with the correct property address highlighted. Another exhibit to the declaration contains a proposed stipulated order against Pamela "for possession of the modular trailer situated at 30464 North River Road."[2] The operative complaint also clearly identified the parcel as 30464 North River Road.

## III.

### *The Sham Lien Sale*

During settlement negotiations, Pamela's former romantic partner, Brian Gagliardi, offered to buy the modular office unit from WSI for $4000. Brian had managed and controlled Pamela's properties since she acquired them in about 2000 and 2007. Brian used Pamela's properties to buy, refurbish, and rent out modular units and trailers.

After the negotiations fell through, Brian purported to conduct a warehouseman's lien sale of the modular office unit identified as the unit MCI rented from WSI. (Com. Code, § 7210.) At the time of sale, Brian was

---

[2] WSI offered to dismiss the lawsuit if Pamela allowed WSI to collect the unit.

4

aware of the pending litigation and WSI's claim to title—*he had personally offered to purchase the unit from WSI*—but Brian did not provide notice of the sale to WSI. The sale notice asserted Pamela was entitled to a "storage and other expenditure lien" in the amount of $134,240 for storage of the unit on her property. The sale (which included some other items) was purportedly for $500 to Jose Perez, a friend of Brian and Pamela.

Brian and Perez together registered the purported sale of the modular office unit with the Department of Housing and Community Development (HCD). The application for registration specifically identified the modular office unit at issue in the underlying lawsuit by the serial number on WSI's title. Counsel for WSI discovered the purported sale less than two weeks before trial was set to commence.

## IV.

### *Trial*

The case proceeded to trial on November 29, 2022. WSI relied on business records authenticated by its recovery and bankruptcy manager and custodian of records to present its case in chief.[3] The records included the certificate of title for the modular office unit showing the unit originally belonged to a company named Resun ModSpace, the rental agreement between ModSpace and MCI,[4] and a Securities and Exchange Commission (SEC) Form 10-K Report as well as other documents showing WSI acquired all of Resun and ModSpace's assets. According to the title, the modular office

---

[3] The manager had additional familiarity with the records because he previously worked for ModSpace.

[4] WSI produced a written "Offer" to rent that was accepted by MCI via signature of its president. The parties then both performed under the detailed terms set forth in the offer to rent.

unit measured 47-by-10 feet and had been assigned a serial number.[5] The unit was one that had axles.

WSI's manager testified, based on WSI's business records, that the modular office unit had been delivered to "30464 North River Road in Bonsall," and that MCI stopped paying rent in April 2019. The manager authenticated the video its employee had taken of the modular office unit on May 25, 2021, after attempts to collect back rent failed, and confirmed the employee identified the unit as the one belonging to WSI. The manager also authenticated an email from WSI to Pamela demanding return of the unit.

The manager prepared a document that set forth and explained the valuation method for the damages sought by WSI, including why, in his view, the value of the unit to WSI was not the same as the value would be at auction. WSI calculated damages at $25,000 based on replacement value. The manager used replacement value instead of market value, explaining: "[WSI is] a leasing company and whenever a unit goes out on rent it's at a fleet standard. When it gets returned, what we do is we repair it back to our fleet standard and put it back on rent, so we reinvest into our assets upon a return and put it back on rent, therefore, a unit will have value for us depending on the unit for 25 or 30 years of rental experience. . . . So if a unit cannot be returned, then we have to go purchase a new one at -- you know, to replace that in our fleet." Selling units was "not a primary business" for WSI. It only sold "heavily damaged" units or units at the end of their life cycle that can no longer be returned to "fleet standard" and oddly configured units they have acquired but cannot successfully rent. The manager further explained,

---

[5] WSI's computer system indicated the unit measured 48-by-12 feet. According to WSI's manager, this discrepancy may have reflected the difference between interior and exterior measurements.

"[R]ight now our fleet usage is very high so there's a demand for our units, and we do want them back as quickly as possible so we can get them back on rent again."

Pamela testified in support of her defense and called Brian, Perez, and a few of her tenants including her daughter. Pamela and her witnesses testified that Pamela's properties were evacuated as a result of the Lilac fire in December 2017. MCI left permanently as of January 15, 2018. Contractors came on the property afterward and stole things, including two trailer units. There was flooding and a mudslide on the property, which caused black soot to be deposited on the inside of the one of the units that had been occupied by MCI, and that unit was now damaged and uninhabitable. In addition, according to Brian, one unit "was completely demolished by the flood and the fire, and that was smashed up and thrown in dumpsters."

Pointing to counsel's typographical error, Pamela suggested there may have been a mix-up with another modular office unit on 30454 North River Road. She claimed this other unit might appear to be on her property, but it was actually on the neighboring parcel. Brian testified the unit on the neighboring parcel was 47-by-10 feet according to measurements he made using aerial photos from the internet. Brian and Perez testified further that, while MCI did abandon a modular office unit on Pamela's property, it measured 10-by-44 feet, not 10-by-47 feet, and it did not have the serial number that appeared on WSI's title.

Putting this evidence together, the thrust of Pamela's defense was that there was no unit on her property that measured 47- or 48-feet by 10 feet, nor any unit with the serial number on WSI's title, and there were multiple allegedly plausible ways the trailer could have disappeared or been misidentified. This defense, however, was *obviously* in direct conflict with

7

the lien sale Brian and Perez had purported to conduct a few weeks earlier of a modular office unit on Pamela's property with the same serial number as the one on WSI's title.

On cross-examination, Brian and Perez admitted they conducted the warehouseman's lien sale. They admitted they knew the serial number matched the number on the title to the modular office unit at issue in the underlying lawsuit, but they nevertheless attempted to register the sale with HCD. They further admitted they intended to sell and register the unit that was the subject of the lawsuit without providing notice to WSI, but claimed they subsequently learned the unit on Pamela's property was not the one owned by WSI. This was because the unit allegedly either had no serial number or had one that was so faded it could not be read. They also claimed the unit was three feet shorter than described on WSI's title.

Stated another way, Gagliardi and Perez admitted they tried to defraud WSI by faking a lien sale, but when they were caught, they claimed the unit they intended to steal belonged to someone else.

V.

*The Trial Court's Ruling and Judgment*

The trial court did not believe Pamela, Brian, and Perez. It made the following rulings and findings:

> "The Court disbelieves the vast majority of the testimony of Brian Gagliardi and Jose Perez. In fact, the Court believes Brian Gagliardi and Jose Perez were both seeking, in their testimony, to affirmatively mislead the Court as to the true facts pertaining to the modular unit. The Court believes that the true facts are that Brian Gagliardi, with assistance from Jose Perez, has concealed the location of the modular unit from [WSI] and has otherwise interfered with [WSI's] proper efforts to regain possession of its modular unit.

8

"The Court finds that the purported lien sale conducted by Brian Gagliardi was invalid and a sham.

"The Court finds that Brian Gagliardi, at all relevant times, was acting on behalf of Pamela Gagliardi in connection with the matters at issue in this lawsuit.

"The Court also disbelieves significant portions of Pamela Gagliardi's testimony, primarily because Brian Gagliardi was seated next to Pamela Gagliardi during her direct testimony and was coaching her on what to say.  [¶] . . .[¶]

"The Court denies [WSI's] request for punitive damages. The Court believes that Brian Gagliardi acted with fraud, oppression and/or malice, but the Court is not persuaded that Pamela Gagliardi authorized or ratified the specific wrongful conduct by Brian Gagliardi."

The trial court entered judgment granting possession of the modular office unit to WSI.  The court indicated it would issue a writ of possession in favor of WSI and supporting postjudgment orders to enable enforcement of the writ should they become necessary.  The court found the value of the modular office unit to be $22,000.  It entered judgment awarding $22,000 to WSI "as an alternative to [WSI] regaining possession of the unit."  The court awarded compensatory damages of $9,752.40 as the "fair rental value of the modular unit for the period that [WSI] has been deprived of possession."

DISCUSSION

As noted, Pamela contends (1) WSI failed to sue her within the statute of limitations, (2) WSI lacked standing to sue because it was not the owner of the modular office unit, (3) the trial court committed various evidentiary errors during trial, (4) the "elements of replevin were not satisfied," and (5) the trial court calculated damages incorrectly.  We uphold the judgment.

9

I.

*Statute of Limitations*

The statute of limitations for replevin and conversion is three years. (Code Civ. Proc., § 338, subd. (c)(1).) The statute of limitations is triggered by an act of wrongful taking of property that belongs to someone else. (*Eleanor Licensing LLC v. Classic Recreations LLC* (2018) 21 Cal.App.5th 599, 612 [replevin]; *AmerUS Life Ins. Co. v. Bank of America, N.A.* (2006) 143 Cal.App.4th 631, 639 [conversion].) Our review is for substantial evidence when the underlying facts are in dispute. (*Pacific Shores Property Owners Assn. v. Department of Fish & Wildlife* (2016) 244 Cal.App.4th 12, 34.)

WSI's complaint falls squarely within the three-year statute of limitations. According to WSI's business records and the testimony of its manager, MCI possessed the modular office unit pursuant to a contract and was in compliance with its terms from the time of delivery in 2016 through March 2019. MCI breached the contract in April 2019 when it stopped paying rent. There is no evidence in the record WSI was aware of any interference with its possessory rights by anyone prior to April 2019 when MCI defaulted. WSI filed suit two years and four months later on August 11, 2021.

Pamela asserts the statute of limitations ran from the time MCI abandoned the modular office unit as opposed to when MCI stopped payment. She cites to no authority for the proposition that a conversion occurs if a party rents property but does not actively use it. We are certain there is none.

Pamela also questions whether WSI's invoices mistakenly apply to a different unit. Pamela did not make this argument during the proceedings below. On appeal, she did not include the relevant exhibits in the clerk's

10

transcript nor transmit them to us. She included only pictures of portions of the exhibits in her reply brief. WSI thus had no opportunity to respond to her contentions about alleged discrepancies in its business records.

Our review, in any event, is for substantial evidence. Here, WSI's manager testified business records show MCI stopped payment for the modular office unit in April 2019. "To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 750 [cleaned up].) That WSI had different customer numbers for MCI and contacted MCI at different office locations at different times and for different purposes, and that WSI may have raised the rent on the unit at some point in time does not make its manager's testimony inherently improbable. WSI's manager moreover specifically explained that customers had both a master file number as well as a customer billing number under a "legacy system" that had since been changed. Substantial evidence thus supported the trial court's implied ruling that the underlying complaint was timely filed.

II.

*Standing*

The owner of personal property has standing to sue for replevin and conversion. (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066 (*Burlesci*); see *Foster v. Sexton* (2021) 61 Cal.App.5th 998, 1020 (*Foster*) [explaining that replevin is a specific type of conversion; the two are no longer separate causes of action].) Our review is, again, for substantial evidence. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489 (*Piedra*).)

11

Here, WSI authenticated a copy of the certificate of title to the modular unit.  The certificate specified "Resun ModSpace" as the owner.  WSI presented testimony and supporting SEC documents to show that WSI acquired a group of companies "including ModSpace, Resun, and [others]," along with all of their assets.  Due diligence for the sale included the delivery of an audited list of acquired assets.  This constitutes substantial evidence to support WSI's standing to sue for replevin and conversion.

### III.

### *Evidentiary Issues*

Pamela contends she objected to the certificate of title on the ground it was a copy and "objected vehemently to this and every exhibit and nearly every statement of [counsel]."  Her arguments are conclusory and unsupported by tailored legal authority.  They are forfeited.  (*Janney v. CSAA Ins. Exchange* (2021) 70 Cal.App.5th 374, 391.)

In her reply brief, Pamela contends the lease agreement between WSI and MCI should have been excluded from evidence for lack of relevance and foundation.  She also contends the application for registration of the sham lien sale by Brian and Perez should have been excluded for lack of foundation.  While these arguments are more specific and cite to the Evidence Code, they are too late.  (*Eyford v. Nord* (2021) 62 Cal.App.5th 112, 126 ["arguments made in a reply brief for the first time are too late"].)  They are forfeited, too.

### IV.

### *Liability for Replevin and Conversion*

"Conversion is the wrongful exercise of dominion over the property of another." (*Duke v. Superior Court* (2017) 18 Cal.App.5th 490, 501 [cleaned up].)  "The elements of a conversion claim are:  (1) the plaintiff's ownership or

12

right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (*Burlesci, supra,* 68 Cal.App.4th at p. 1066.) Under current California law, the common law action for replevin, which seeks the return of converted property as an alternative to payment of damages, is codified at Code of Civil Procedure section 667 and has technically been subsumed into the tort of conversion. (*Foster, supra,* 61 Cal.App.5th at p. 1020.) Explained another way, replevin is a historical label for a particular type of cause of action for conversion, one where the plaintiff seeks " 'the recovery of specific personal property.' " (*Ibid.*, quoting *Berry v. Bank of Bakersfield* (1918) 177 Cal. 206, 209.)

Our review of the question of liability for replevin and conversion is once again for substantial evidence. (*Piedra, supra,* 123 Cal.App.4th at p. 1489.) Under the substantial evidence standard of review, the evidence is reviewed in a light most favorable to the prevailing party. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

Pamela contends WSI failed to identify its modular office unit as its own with adequate "precision." She also repeats her trial level argument that the unit appears to be located on a neighboring property and there may have been a mix-up. Pamela has not complied with the rules governing what an appellant must show in order to obtain a reversal for insubstantial evidence. Her arguments are forfeited.

An appellant who challenges the sufficiency of the evidence must set forth in her opening brief *all* of the material evidence on point; this includes evidence unfavorable to her position. "An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there

was no substantial evidence to support the judgment. An appellant . . . who cites and discusses only evidence in her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) In addition, an appellant who has misrepresented the record when arguing an issue in the opening brief may be deemed to have forfeited that issue. (*Perry v. Kia Motors America, Inc.* (2023) 91 Cal.App.5th 1088, 1095–1096; see also Cal. Rules of Court, rule 8.204(a)(2)(C).)

Pamela fails to accurately represent the record in her briefs. On the element of ownership, she claims "[WSI] astonishingly failed to provide an accurate description of the unit." This is simply untrue. The certificate of title had a unique serial number. WSI's employee moreover *recorded a video* that identified a modular office unit on Pamela's property as the one it sought to repossess. Pamela's briefs make no mention of the serial number; nor do they disclose and discuss the video.

Pamela also claims, "No assignment of interest was offered as evidence." But she fails to disclose testimony and documentary evidence that WSI acquired title when it acquired ModSpace, Resun, and related companies and all of their assets.

On the element of wrongful exercise of dominion and control over the unit, Pamela claims, "No demand letter was made or presented by [WSI] during the trial." This is also patently untrue. WSI's manager authenticated WSI's Exhibit 7 by stating, "This is an email from [WSI's employee] to gogreengagliardi@gmail demanding . . . return of the unit." But even more

14

egregious, the opening brief does not reveal nor attempt to explain the sham lien sale by Brian and Perez.[6]

Despite Pamela's violation of our fundamental rules, we exercise our discretion to address liability for replevin and conversion. We do this to ensure our opinion cannot be misread to cast doubt on WSI's right to recover the modular office unit or, if recovery cannot be had, to damages.

The first element of conversion—ownership—was satisfied. As already explained, WSI presented substantial evidence at trial that it was the owner of a modular office unit identified by a serial number on a certificate of title. The certificate of title was copied and authenticated and admitted into evidence at trial, and WSI's manager testified WSI acquired several related corporate entities, including the entity that appeared on the certificate, and all of their assets.

Pamela's contention that the unit was misidentified is without merit. Under the substantial evidence standard of review, we resolve conflicting testimony about the unit's identification—including Brian's testimony that the modular office unit on his property was three feet shorter than stated on the title—in favor of supporting the judgment. (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.) But more to the point, the trial court specifically found Brian's testimony about the unit to be incredible: "[T]he Court believes that Brian Gagliardi and Jose Perez were both seeking, in their testimony, to affirmatively mislead the Court as to the true facts

---

[6]  In response to WSI's discussion in the respondent's brief, the reply brief unpersuasively and belatedly argues the application for registration of the fake lien sale should not have been admitted into evidence and, despite the serial number on the application, refers to a different unit.

pertaining to the modular unit." We defer to the trial court's assessment of credibility. (*Catherine D. v. Dennis B.* (1990) 220 Cal.App.3d 922, 931.)

The second element—that Pamela wrongfully converted the modular office unit to her own use or disposed of it—was satisfied by overwhelming evidence. WSI's manager testified the unit was delivered to Pamela's property at 30464 North River Drive in Bonsall. On May 25, 2021, a WSI employee located the unit on Pamela's property, identified it, and videotaped it. WSI asked Pamela to allow access to her property to recover the unit and sued her when she declined. Instead of returning the unit, or allowing WSI access to Pamela's property to recover the unit, or purchasing the unit at an agreed price, Brian conducted a sham lien sale and registered it with the HCD in the name of a friend.[7]

The third element—damages—was also satisfied. WSI's manager testified WSI continued to seek recovery of the unit (replevin), but provided testimony and a worksheet to show damages in the event that recovery could not be accomplished (conversion).

We hold the trial court correctly entered judgment in favor of WSI for recovery of the modular office unit and for damages in the event recovery cannot be accomplished.

V.

*Damages*

Finally, Pamela contends the trial court calculated damages incorrectly. The court found "the value of the modular unit is $22,000," and that WSI was in addition "entitled to recover compensatory damages of $9,752.40, representing the fair rental value of the modular unit for the

---

[7] Pamela and Brian both testified Brian acted as Pamela's agent with respect to matters concerning the use of her properties.

period that [WSI] has been deprived of possession." The court did not explain how it made these determinations. Pamela moved for a new trial, but not on the question of improperly calculated or excessive damages to WSI.

" 'A failure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or by the court.' " (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759.) " '[I]f ascertainment of the amount of damages turns on the credibility of witnesses, conflicting evidence, or other factual questions, the award may not be challenged for inadequacy or excessiveness for the first time on appeal.' " (*Ibid.*) "However, it is also established that 'the failure to move for a new trial does not preclude a party from asserting error in the trial of damages issues—e.g., erroneous evidentiary rulings, instructional errors, or failure to apply the proper measure of damages.' " (*Ibid.*)

Pamela forfeited her contention the trial court's damages award was excessive in light of the auction value for similar units, depreciation of the unit, and possible fire and flood damage. Assessing her contention would require the resolution of conflicting evidence and she failed to move for a new trial on this point. For the same reason, she forfeited her challenge to the amount of the court's award of damages for loss of use.

As for Pamela's contention the trial court applied the wrong measure of damages, her understanding of the law is incorrect. The measure of damages for conversion of personal property is set forth in Civil Code section 3336 and it is not restricted to value at the time of conversion:

> "The detriment caused by the wrongful conversion of personal property is presumed to be:
>
> "First—The value of the property at the time of the conversion, with the interest from that time, *or, an amount*

17

*sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted*; and

"Second—A fair compensation for the time and money properly expended in pursuit of the property." (Civ. Code, § 3336, italics added.)

The indemnification prong of Civil Code section 3336 has been construed in the context of mobile home units to permit an award for lost profits. (*Myers v. Stephens* (1965) 233 Cal.App.2d 104, 116–117.) In addition, Civil Code section 3355 allows plaintiffs to assert and prove that property has a "peculiar value" against a "willful wrongdoer":

"Where certain property has a peculiar value to a person recovering damages for deprivation thereof, or injury thereto, that may be deemed to be its value against one who had notice thereof before incurring a liability to damages in respect thereof, or against a willful wrongdoer." (Civ. Code, § 3355.)

(See *King v. Karpe* (1959) 170 Cal.App.2d 344, 348–349 [ruling that a cow could have special value beyond the slaughter value of its meat to a breeder who was building up his herd].)

The trial court did not explain how it calculated the damages award for the modular office unit, but it also did not award the full replacement value of $25,000 sought by WSI. Given the flexibility of the law in terms of permitting damages awards that reflect special value to a victim of willful conversion, as well as the indemnification prong of Civil Code section 3336, which authorizes the indemnification of "natural, reasonable, and proximate" losses, we cannot say on this record the court's award of $22,000 was based on an incorrect measure of damages.

18

## DISPOSITION

Judgment is affirmed in all respects.  Costs are awarded to WSI.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


DO, Acting P. J.

WE CONCUR:


CASTILLO, J.


RUBIN, J.

19